UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| DAVID LITTLE and RUTH ANN LITTLE, as parents and next of kin to TYLER LITTLE, | ) ) ) ) | |
| Plaintiffs, | ) ) | 2:21-CV-00047-DCLC-CRW |
| v. | ) ) ) | |
| CITY OF MORRISTOWN, TENNESSEE, et al., | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

"[T]he Constitution 'generally confer[s] no affirmative right to government aid, even where such aid may be necessary to secure life, liberty, or property interests.'" *Trozzi v. Lake Cnty.*, 29 F.4th 745, 751 (6th Cir. 2022) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989)). However, "[a] prisoner's liberty deprivation renders him unable 'to care for himself,' thereby 'just[ifying]' an affirmative duty of care for that prisoner." *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976)). In this action, Plaintiffs David Little and Ruth Ann Little allege Morristown Police Department ("MPD") officers and Hamblen County Jail ("the Jail") officials failed to fulfill their affirmative duties to care for their 23-year-old son, Tyler Little, who was arrested by MPD officers and died while waiting to be booked into the Jail. The matter is currently before the Court on the motions for summary judgment filed by the City of Morristown and its individual officials ("City Defendants") [Doc. 65] and by Hamblen County and its individual officials ("the County Defendants") [Doc. 60]. For the reasons that follow, Defendants' motions are **GRANTED IN PART AND DENIED IN PART**.

# I.    BACKGROUND

On the afternoon of Sunday, March 8, 2020, Little and his girlfriend left their home, where they lived with Little's parents, to go to the store and to stop by Pal's Sudden Service ("Pal's"), a fast-food restaurant, to get lunch [*Id*. at pg. 24].  That same afternoon, MPD Officer Devon Gillett ("Officer Gillett") went through the drive-thru at Pal's and parked across the street to take his lunch break [Doc. 65-5, pgs. 3–4].  Just before 2:30 p.m., a Pal's employee knocked on Officer Gillett's window and informed him that a person, later identified as Little, was asleep behind the wheel of a vehicle in the drive-thru [*Id*. at pgs. 4–5].  Officer Gillett initiated a traffic stop of Little's vehicle at a nearby gas station [*Id*. at pg. 5].  MPD Officer Matthew Johnson arrived as back-up and posted on the passenger side of the vehicle [Doc. 81-3, 3:36].

During his initial interaction with Little, Officer Gillett noticed his speech was slurred, his eyes were bloodshot, and he was barely able to keep his eyes open, all of which indicated that Little was intoxicated [Doc. 60-1, pgs. 8–9].  Little explained that he had been up until about 4:00 a.m. partying and drinking, was getting over a cold, and worked third shift [*Id*. at pg. 23; Doc. 81-3, 00:50–1:48].  Little also informed Officer Gillett that he took several prescribed medications, including Gabapentin, Alprazolam, and Fluoxetine, but denied taking any medications that were not prescribed to him [Doc. 81-3, 1:53–2:30].  Officer Gillett administered three field sobriety tests—the horizontal gaze nystagmus, the walk and turn, and the one leg stand—each of which Little completed but ultimately failed [*Id*. at 3:20–7:54; Doc. 65-4, pg. 8].

Officer Gillett briefly patted Little down, and, with the assistance of Officer Johnson, placed him in handcuffs and informed him that he was being detained because he was "literally falling asleep" and there were concerns about him operating a vehicle while taking the medications he disclosed [Doc. 81-3, 7:55–9:27].  Officer Gillett proceeded to ask Little if he would be willing

to go to the hospital for a blood draw and, while he initially inquired as to whether Officer Gillett could just follow him home or if he could have someone come pick him up, Little ultimately agreed to go to the hospital [*Id.* at 9:28–10:39]. After placing Little in the back seat of his cruiser, Officer Gillett spoke to Little's girlfriend, asked for Little's driver's license, and explained that he was taking Little to the hospital and likely to jail because he was "under the influence of something" [*Id.* at 10:54–13:21]. Officer Gillett testified, however, that he did not recall Little smelling like alcohol [Doc. 81-4, pg. 31].

While en route to the hospital, Little engaged in conversation with Officer Gillett and reiterated that he had been drinking until about 4:00 a.m. and that he took his medications that morning [Doc. 81-3, 15:57–16:11].[1] Upon arriving at the hospital, Officer Gillett removed the handcuffs from Little and the two engaged in further conversation as they walked to the Emergency Room ("ER") entrance [*Id.* at 24:01–25:45]. While speaking to Officer Gillett and the hospital employee at the ER reception desk, Little could barely keep his eyes open and appeared to fall in and out of sleep while standing up [*Id.* at 26:12–33:46]. His speech became more slurred and harder to understand, and he asked Officer Gillett what would happen if the blood test results were "dirty" as in if they showed that he took a drug for which he did not have a prescription [*Id.* at 26:43–27:03]. Officer Gillett responded, "Let's cross that bridge when we get there, you know what I mean?" [*Id.* at 27:04–27:07].

Once in the triage room, Little's demeanor progressively deteriorated. He continued to fall asleep and occasionally mumbled incoherently [*Id.* at 35:35–42:00]. At one point, Little held his hands over his eyes and Officer Gillett asked if he was okay, to which Little responded "yeah, oh

---

[1] Little mentioned taking Xanax, which is the brand name for the prescription medication Alprazolam that he informed Officer Gillett about at the beginning of the traffic stop [Doc. 65-4, pg. 6].

3

yeah . . . I am just really tired" [*Id*. at 39:14–39:26]. When Officer Gillett attempted to recap Little's consent to the blood draw, he had to wake him up to get a response [*Id*. at 40:06–40:30]. Not long thereafter, Little fell asleep sitting up and remained asleep, audibly snoring, until Officer Gillett woke him when two phlebotomists came into the room [*Id*. at 42:00 – 51:50].[2] Little kept his eyes closed, rubbed his face, and mumbled incoherently [*Id*. at 51:50–51:57]. Officer Gillett and Debra Bullion, one of the phlebotomists, noted multiple times that Little was "sweating pretty bad" [*Id*. at 53:24–53:46]. Little continued to mumble incoherently but mentioned something about being on blood pressure medication [*Id*. at 54:37–54:49].

Little slept through the blood draw, and when one of the phlebotomists made a comment about how long it was taking due to using a smaller needle, Officer Gillett responded, "Oh, it's fine, I don't think he's minding too much right now" [*Id*. at 56:42–59:23]. After the blood draw, Little stood up, mumbled, "fist bumped" Officer Gillett, and walked unassisted back to the police cruiser [*Id*. at 59:35–1:01:10]. Officer Gillett obtained Little's signature on the consent form for the blood draw and informed him that he was being charged with driving under the influence [*Id*. at 1:01:39–1:01:55]. Little then asked if he could smoke a cigarette, prompting Officer Gillett to question whether he had cigarettes on him. He pulled a pack of cigarettes, a small bag of marijuana, and a box of THC oil out of his pocket and handed them over to Officer Gillett [*Id*.].

Officer Gillett proceeded to transport Little to the Jail but turned off his body camera minutes before arriving [*Id*. at 1:07:57]. At approximately 3:40 p.m., Corrections Officer Anthony Smith ("Officer Smith") let Officer Gillett and Little into the Jail through the back "sally port"

---

[2] The two phlebotomists who performed Little's blood draw are certified for venipuncture but have no further medical education or licensing [Doc. 81-10, pgs. 10, 15]. Phlebotomists are not allowed to diagnose or treat patients [*Id*. at pg. 23]. Phlebotomists also cannot take vital signs [*Id*. at pg. 26]. Rather, their job is limited to drawing blood [*Id*. at pg. 27].

4

door [Doc. 81-11, pg. 5; Doc. 81-12, 00:49]. Officer Gillett told Officer Smith "everything that [he] knew," including that Little was arrested for DUI, that he had been up all night drinking, had prescriptions, and possessed marijuana [Doc. 81-4, pg. 51; Doc. 81-11, pgs. 6, 33].[3] Although Jail policies require the admitting officer to examine incoming inmates for obvious signs of injury or illness and to conduct a medical, dental, and mental screening [Doc. 81-14, pgs. 3–4], neither Officer Smith nor any other officer medically screened Little [Doc. 81-11, pg. 26]. Officer Smith simply had Little remove his hat and shoes and place his arms against the wall to conduct a pat-down [Doc. 81-12, 01:31–2:59]. Thereafter, Little put his shoes and hat back on and walked to the booking area where he sat down on a stool [*Id*. at 3:00–3:31]. Officer Smith noted that Little "seemed drowsy" and requested a mat so he could lay down [Doc. 81-11, pg. 33].

While waiting for a mat, Little drank a cup of water that an inmate poured for him and leaned back as though he was going to sleep [Doc. 81-12, 4:31–11:29]. At 3:55 p.m., a corrections officer put a mat on the floor where Little laid down [*Id*. at 14:41–16:12]. Officer Gillett walked by and saw Little, said something to him, and, shortly after, Little stood up and took his pullover off [*Id*. at 16:18–16:34]. Little remained standing, swaying, while he talked to someone in the corner for a minute before laying back down [*Id*. 16:42–18:01]. Officer Gillett returned shortly thereafter with an orange jail shirt, and Little stood up and put it on while talking to the person in the corner again [*Id*. at 18:33–20:36]. At approximately 4:02 p.m., Little laid back down on the mat for a moment before getting back up, grabbing his cup of water, and stumbling around for a few minutes [*Id*. at 21:10–24:10]. He laid back down on the mat at approximately 4:05 p.m. and

---

[3]     The record is unclear as to whether Officer Smith knew about the other prescriptions Little divulged to Officer Gillett (Gabapentin, Alprazolam, and Fluoxetine) [Doc. 81-3, at 18:28 –18:29]. Officer Gillett states that he told Officer Smith everything he knew about Little's prescriptions [Doc. 81-4, at 51]. Yet the only two prescriptions listed in Officer Smith's incident report are Suboxone and Klonopin.

5

fell asleep [*Id*. at 24:11–25:33]. For the next 30 minutes, Little slept on the mat face down, moving periodically [*Id*. at 25:33–56:10]. At 4:37 p.m., Little raised his head momentarily [*Id*. at 56:11]. This appears to have been Little's last movement until corrections officers discovered him without a pulse approximately an hour and a half later.

Surveillance footage shows that between 4:05 p.m. and 5:57 p.m. multiple jail officials walked past Little and through a door right next to where his head was positioned. Among those officials were Officer Smith, Corporal Dianna Brown ("Corporal Brown"), Corrections Officer Austin Miller ("Officer Miller"), and Corrections Officer Chad McFarland ("Officer McFarland") [Doc. 60-15, pg. 10]. At 5:36 p.m., Officer McFarland handed out sandwiches and placed one next to Little, who, at this point, had not moved for an hour [Doc. 81-12, 1:55:23]. Little did not move when Officer McFarland put the sandwich down and Officer McFarland did not attempt to wake Little [*Id*.]. A few seconds later, the same inmate who initially poured Little the cup of water crouched down and looked at Little and said something to Officer McFarland while pointing toward Little [*Id*. at [*Id*. at 1:55:52–1:56:28]. The inmate continued to walk around the booking area and, a minute later, pointed to Little again while seemingly talking to someone out of view of the camera [*Id*. at 1:57:47–1:57:59].

Approximately 20 minutes later at 6:00 p.m., Officers Smith and Miller, along with Corporal Brown and a nurse, discovered that Little was not breathing [Doc. 81-11, pg. 33]. Little's arms were white and purple and he did not have a pulse [*Id*.]. When the nurse rolled Little over, Officer Miller noticed that Little's face was also purple [*Id*.]. The nurse started CPR, administered Narcan, and advised the corrections officers to call 911 [*Id*.]. Officer Smith and the nurse continued CPR until emergency medical services ("EMS") arrived at approximately 6:06 p.m. and transported Little to the hospital [Doc. 81-12, 2:26:00]. The EMS report indicates that Little was

unresponsive, his pupils were fixed and dilated, and he had "copious amounts of vomit on [his] face and neck" [Doc. 81-17]. EMS intubated Little and administered Narcan, two bicarbs, and four epinephrines, but he remained asystolic and was pronounced dead at 6:45 p.m. [*Id*.]. The autopsy report and death certificate list Little's cause of death as "oxymorphone and bupropion intoxication" [Doc. 65-1, pg. 3; Doc. 81-18, pg. 2]. The lab results from the blood draw also came back negative for the presence of alcohol [Doc. 86-1].

Based on the events leading up to Little's death, Plaintiffs initiated this action against the City and its individual officials—Officer Gillett, Officer Johnson, and MPD Chief Roger Overholt ("Chief Overholt")—along with the County and its individual officials—former Hamblen County Sheriff Esco R. Jarnagin ("Sheriff Jarnagin"),[4] Hamblen County Jail Administrator Teresa Laws ("Captain Laws"), Corporal Brown, and Officers Smith, Miller, and McFarland—asserting various claims pursuant to 42 U.S.C. § 1983 for violations of the Fourteenth Amendment and state-law claims. The City and County Defendants now move for summary judgment on each of Plaintiffs' claims.

## II. LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In ruling on a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Where video evidence is present, however, the Court views "the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).

---

[4]  Chad Mullins took over as Hamblen County Sheriff in August of 2022 [Doc. 60-5, pg. 8].

The moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). Once the movant has discharged this burden, the nonmoving party must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). A mere scintilla of evidence is not enough. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Based on the record, the Court must determine whether a fair-minded jury could return a verdict in favor of the nonmovant. *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment in favor of the movant. *Celotex*, 477 U.S. at 323.

## III.     DISCUSSION

Pursuant to Section 1983, Plaintiffs allege Officers Gillett and Johnson and the individual County officials—Corporal Brown and Officers Smith, Miller, McFarland—failed to protect Little from a substantial risk of harm and failed to provide medical care for Little's serious medical needs, in violation of the Fourteenth Amendment. Plaintiffs also seek to hold the City and Chief Overholt liable for the alleged constitutional violations of Officers Gillett and Johnson. Likewise, Plaintiffs seek to hold the County, Sheriff Jarnagin, and Captain Laws liable for the alleged constitutional violations of the individual County officials. Finally, Plaintiffs assert state-law claims of wrongful death and negligence and/or gross negligence against all Defendants and intentional infliction of emotional distress ("IIED") against Officers Gillett and Smith.

The City and County Defendants assert the individual and supervisory officials did not violate Little's constitutional rights and, if so, they are entitled to qualified immunity. Defendants also contend Plaintiffs have failed to establish municipal liability and that the state-law claims fail as a matter of law. Each of Plaintiffs' claims are examined in turn, beginning with Section 1983.

### A.    Section 1983

42 U.S.C. § 1983 provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979).  To succeed under Section 1983, a plaintiff must show "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).[5]  A plaintiff must also establish personal involvement in the activity that forms the basis of the complaint. *See Ashcroft v. Iqbal*, 555 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government official defendant, through the official's own individual actions, has violated the Constitution.").

### 1.    Individual Liability

Plaintiffs assert the City and County Defendants deprived Little of his rights under the Fourteenth Amendment by acting with deliberate indifference to his health and safety, both by failing to protect him and failing to provide adequate medical care.  The individual defendants assert the defense of qualified immunity and argue they are entitled to summary judgment because (1) they did not violate Little's constitutional rights and (2) even if their actions resulted in a constitutional violation, the right at issue was not clearly established.

"Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights." *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 608 (6th Cir. 2015).  Once raised, a plaintiff may overcome the defense by showing that (1) viewing the facts in the light most favorable to the

---

[5]    Each of the individual defendants and the defendant municipalities are "persons" acting under the color of state law. *Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020) (the Supreme "Court has long interpreted [§ 1983] to permit suits against officials in their individual capacities."); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978) ("[M]unicipalities and other local government units" are "among those persons to whom § 1983 applies.").

9

plaintiff, the defendant's actions violated a constitutional right and (2) such right "was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court, in its discretion, may decide which of the two prongs to address first, taking into account "the circumstances of the particular case at hand." *Pearson*, 555 U.S. at 236. The Court begins with the first prong—whether the individual defendants' actions violated a constitutional right—before turning to whether the right at issue was clearly established.

<u>Constitutional Violation</u>

As mentioned above, Plaintiffs allege Fourteenth Amendment violations under two separate but related theories—failure to protect and failure to provide medical care. "[P]rison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984)).[6] "A prison official violates an inmate's rights only if the official is 'deliberate[ly] indifferen[t] to inmate health or safety.'" *Westmoreland v. Butler Cnty.*, 29 F.4th 721, 726 (6th Cir. 2022) (quoting *Farmer*, 511 U.S. at 833). A claim of deliberate indifference based on the failure to protect or to provide medical care requires satisfaction of both an objective and a subjective prong.

As to the objective prong, a failure-to-protect claim requires a showing that the inmate was "'incarcerated under conditions posing a substantial risk of serious harm,'" *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001) (quoting *Farmer*, 511 U.S. at 834), and a claim premised on the failure to provide medical care requires "the existence of a sufficiently serious medical need."

---

[6] Although "[t]he analysis set forth in *Farmer*" is "rooted in the Eighth Amendment," the Sixth Circuit has held that it "applies with equal force to a pretrial detainee's Fourteenth Amendment claims." *Richko v. Wayne Cnty.*, 819 F.3d 907, 915 (6th Cir. 2016).

10

*Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018) (citation omitted). Historically, both claims also required a subjective showing that the defendant official "had 'a sufficiently culpable state of mind.'" *Curry*, 249 F.3d at 506 (quoting *Farmer*, 511 U.S. at 834); *Winkler*, 893 F.3d at 891. "A 'sufficiently culpable state of mind' is one in which 'the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Curry*, 249 F.3d at 506 (quoting *Farmer*, 511 U.S. at 837); *Winkler*, 893 F.3d at 891.

Recently, however, the Sixth Circuit modified the subjective standard for deliberate-indifference claims brought by pretrial detainees in light of *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), which removed the subjective prong for pretrial detainees' excessive force claims. *Brawner v. Scott Cnty.*, 14 F.4th 585, 596 (6th Cir. 2021) *cert. denied*, 143 S. Ct. 84 (2022). The Sixth Circuit reiterated that "'deliberate indifference' is a judicial gloss" and, as a result, "the definition provided by the Court in one context is not necessarily appropriate in another." *Id*. at 595. "Given *Kingsley*'s clear delineation between claims brought by convicted prisoners under the Eighth Amendment and claims brought by pretrial detainees under the Fourteenth Amendment," the Sixth Circuit held that "applying the same analysis to these constitutionally distinct groups is no longer tenable." *Id*. at 596. Ultimately, rather than eliminate the subjective prong, the Sixth Circuit "lower[ed] the subjective component from actual knowledge to recklessness." *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 316 (6th Cir. 2023). Plaintiffs' claims are examined in turn under the longstanding objective prong and the modified subjective prong.[7]

---

[7]     Although the County Defendants maintain that the Court should employ pre-*Brawner* law in analyzing Plaintiffs' claims because "this incident occurred more than a year before *Brawner* was decided" [Doc. 61, pg. 10, n.7], *Brawner* is controlling precedent. *See Helphenstine*, 60 F.4th

11

*Failure to Protect*

Following *Brawner*, to establish deliberate indifference based on the failure to protect, "a defendant officer must act intentionally in a manner that puts the [pretrial detainee] at substantial risk of harm, without taking reasonable steps to abate that risk, and by failing to do so actually cause the [detainee's] injuries." *Westmoreland v. Butler Cnty.*, 29 F.4th 721, 729 (6th Cir. 2022). The City Defendants assert that a failure-to-protect theory "has no application to the claims brought by the Plaintiffs because there is no allegation that Little was subjected to a 'private act of violence' or any act of violence" because he "died of a self-inflicted . . . drug overdose" and "[h]is death was the result of his own actions" [Doc. 66, pg. 18]. But the Sixth Circuit recently held that "an inmate who suffers a drug overdose will not *automatically* lose a failure-to-protect claim simply because he voluntarily ingested the drugs." *Zakora v. Chrisman*, 44 F.4th 452, 471 (6th Cir. 2022)(emphasis added). Nonetheless, Plaintiffs expressly abandon this claim against Officers Gillett and Johnson [Doc. 87, pg. 1, n.1]. Therefore, the City Defendants' motion for summary judgment as it relates to this claim is **GRANTED**, and the failure-to-protect claim against Officers Gillett and Johnson is **DISMISSED**.

The County Defendants do not mention the failure-to-protect claim against Corporal Brown and Officers Smith, Miller, and McFarland.[8] Rather, they assert "Plaintiffs' Complaint is littered with 66 pages and 11 theories of liability" but "there really is just one general claim: Tyler

---

at 317. Pre-*Brawner* case law, however, is properly examined in conducting the clearly established inquiry for incidents that occurred prior to the *Brawner* decision. *Trozzi*, 29 F.4th at 761. Thus, the Court applies the modified subjective standard in analyzing the existence of a constitutional violation but will look to case law in existence prior to the incident at issue to determine if such constitutional right was clearly established.

[8]    Plaintiffs also assert a separate claim for failure to protect against Sheriff Jarnagin and Captain Laws in their individual supervisory capacities [Doc. 1, pgs. 45–48]. Supervisory liability is examined separately below.

Little was allegedly deprived of constitutionally adequate medical care" [Doc. 61, pg. 6]. Thus, the County Defendants focus their argument on Plaintiffs' claim for failure to provide medical care and do not present any argument regarding the failure-to-protect claim. The Court cannot grant summary judgment "on grounds not raised by a party" without first providing notice to the opposing party and a reasonable time to respond. Fed.R.Civ.P. 56(f)(2). Accordingly, because the County Defendants did not move for summary judgment on Plaintiffs' failure-to-protect claim, that claim proceeds.

### Failure to Provide Medical Care

After *Brawner*, a pretrial detainee's deliberate indifference claim based on the failure to provide medical care now requires an objective showing that the pretrial detainee "had a sufficiently serious medical need" and a subjective showing that the defendant official "'acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Helphenstine*, 60 F.4th at 317 (quoting *Brawner*, 14 F.4th at 596). This standard is "more than negligence but less than subjective intent—something akin to reckless disregard." *Brawner*, 14 F.4th at 596 (citation and quotation marks omitted). "A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Greene v. Crawford Cnty.*, 22 F.4th 593, 607 (6th Cir. 2022) (internal quotations and citation omitted).

Viewing the facts in the light most favorable to Plaintiffs, a reasonable juror could conclude that Little's medical need was both serious and obvious. First, the seriousness of Little's drug intoxication is beyond debate because it resulted in his death. *See Burwell v. City of Lansing*, 7 F.4th 456, 463 (6th Cir. 2021) ("we have routinely held that a condition resulting in death is

'sufficiently serious' to meet the objective component."). As to obviousness, genuine disputes of fact remain. Little's physical demeanor and rapid deterioration presented cause for concern. He reportedly fell asleep at the wheel of his vehicle at the drive-thru, appeared severely intoxicated—exhibiting slurred speech, bloodshot eyes, sweating, and unstable gait. Initially, Little could barely keep his eyes open but within 35 minutes of the initial traffic stop, he was falling asleep while standing up and his speech transformed into an incoherent mumble. Despite having a needle stuck into his arm, he also slept through the entire blood draw. Finally, the record is clear that Little vomited at some point while lying on the Jail floor, which is "a clear manifestation of internal physical disorder." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004). A lay person presented with all, or even a portion, of the foregoing could reasonably conclude that some type of medical attention was necessary.

Turning to the subjective component, the Court must determine whether the individual defendants acted with reckless disregard, i.e., whether they acted deliberately and recklessly "based on the information that was available to them at the time." *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014). "The subjective component . . . must be addressed for each officer individually." *Winkler*, 893 F.3d at 891. Therefore, each individual defendant's actions on the date in question are addressed in turn.[9]

*Officer Gillett*. Plaintiffs argue Officer Gillett had reason to be concerned about Little's condition because he observed Little's symptoms and knew that he had taken multiple prescription drugs and was in possession of marijuana. Moreover, at the hospital, Little suggested that he had taken a drug that was not prescribed to him. Officer Gillett asserts he believed Little was "simply

---

[9]     Plaintiffs expressly abandon this claim against Officer Johnson [Doc. 87, pg. 1, n.1]. Therefore, Officer Johnson is not included in the analysis.

14

intoxicated" [Doc. 66, pg. 22] and that he did not request medical care for Little because Little "wasn't medical distressed," because he deferred to the medically trained people at the hospital, and because he believed Little would receive a medical evaluation when he was booked into the jail [Doc. 81-4 at 23, 38, 66].

The credibility of Officer Gillett's assertion that he did not believe Little was in medical distress is a matter for the jury to decide and is genuinely disputed by the apparent obviousness of his condition. *See Rouster*, 749 F.3d at 447 ("a factfinder may conclude that [an officer] knew of a substantial risk from the very fact that the risk was obvious."). Additionally, although a "a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he reasonably defer[s] to the medical professionals' opinions[,]" *Greene*, 22 F.4th at 608, no medical professional offered an opinion as to Little's condition to which Officer Gillett could defer. In fact, the only hospital employees who came into direct contact with Little were a receptionist and two phlebotomists, neither of which treated Little or medically evaluated him. Finally, Gillett's belief that Little would receive a medical evaluation when he was booked into the Jail (and thus that he needed not take any action to have Little medically examined) can reasonably be inferred as circumstantial evidence that he deliberately disregarded the need for medical care and simply passed off the responsibility to Jail officials. *Burwell*, 7 F.4th at 466 ("courts may infer from circumstantial evidence that a prison official had the requisite knowledge).

Despite the assertion that Little's symptoms appeared to be no more than simple intoxication, Officer Gillett does not recall Little smelling like alcohol and, although Little admitted to drinking until 4:00 a.m., he stopped Little over 10 hours later at 2:30 p.m. In sum, Officer Gillett knew Little had ingested multiple prescription medications and that he also hinted to the possibility that he had taken other narcotic medications which he was not prescribed. Officer

15

Gillett also observed Little's slurred speech transform into an incoherent mumble over the course of 30 minutes to an hour and Little's struggle to keep his eyes open quickly transformed into a complete lack of ability to remain awake and alert. The facts known to Officer Gillett, taken together with Little's rapid depreciation, are enough to create a genuine dispute as to whether he knew or should have known that Little was suffering from an overdose and recklessly disregarded his need for medical care.

*Corporal Brown.* Corporal Brown, the shift supervisor, remembers seeing Little when she came into the jail. From her vantage point in the control room, she should have had a good view of Little as he lay prone and motionless on the floor. Corporal Brown did not check on Little and apparently did not direct anyone else to do so. However, there is no evidence as to what she actually saw from the control room or whether what she saw would reasonably have put her on notice that Little was suffering from a serious medical condition. There is no evidence that she knew of Little's drug use. And because her shift began at 5:00 p.m., she would not have observed Little's physical symptoms when he arrived at the jail. In sum, Corporal Brown's failure to check on Little may have been negligent, but the record does not support a finding that she acted deliberately or recklessly in the face of an unjustifiably high risk of harm to Little. Accordingly, Corporal Brown is entitled to summary judgment.

*Officer Miller.* Officer Miller also began his shift at 5:00 p.m. Although he walked past Little and never stopped to verify his well-being, like Corporal Brown, Officer Miller would not have observed Little's symptoms when he entered the jail and there is no evidence indicating that he knew or should have known of Little's need for medical care. Thus, even viewing the facts in the light most favorable to Plaintiffs, Officer Miller's failure to check on Little does not rise to the level of deliberate indifference. Accordingly, he is entitled to summary judgment.

*Officer McFarland*.  Like Corporal Brown and Officer Miller, Officer McFarland also began his shift at 5:00 p.m., after Little had already been admitted and had been sleeping for approximately 30 minutes.  However, Officer McFarland handed out sandwiches nearly 20 minutes before Little was found without a pulse with purple arms and a purple face.  He sat the sandwich right next to Little with a close-up view of Little's arms, which were exposed in the short-sleeved Jail shirt Little was wearing.  Additionally, there is video surveillance of an inmate drawing attention to Little shortly after Officer McFarland handed out sandwiches.  Viewing these facts in the light most favorable to Plaintiffs, a reasonable juror could conclude that Officer McFarland knew or should have known Little needed medical attention, but recklessly disregarded the risk.

*Officer Smith*.  Unlike the other County officials, Officer Smith was on duty at 3:40 p.m. when Little entered the jail.  As the admitting officer, he had the opportunity to observe Little's physical symptoms.  Significantly, he also knew of Little's drug use.  Officer Gillett told Officer Smith everything he knew, including that Little had been arrested for a DUI, was in possession of marijuana, and had prescriptions including Suboxone and Klonopin.  A jury could conclude that under these circumstances Officer Smith was on notice that Little needed monitoring.  Moreover, Officer Smith failed to perform a medical evaluation before admitting Little into the Jail.  Although violating a policy is not necessarily sufficient to show deliberate indifference, Officer Smith's failure to screen Little, despite being aware of the screening requirement, is relevant to establishing whether he acted with reckless disregard. *See Burwell*, 7 F.4th at 476 n.7 ("whether an officer complied with policy can be relevant to establishing the officer's knowledge of the risk to an inmate and whether the officer disregarded that risk.") (internal citations omitted).

A jury could also infer that Officer Smith saw Little lying prone and motionless on the floor for an hour and a half yet failed to take any investigative steps to mitigate a risk of harm. Officer Smith was on duty when Little made his final movement at 4:37 p.m. He walked by Little at least once while he was lying on the floor and noted in his report that Little was sleeping and snoring for hours. Although Officer Smith acknowledges that everyone was obligated to supervise the common area (including Officer Smith himself), surveillance footage does not show Officer Smith or any other officer attempting to interact with Little or otherwise verify his well-being.

Officer Smith offers several explanations for his lack of concern. Specifically, he asserts there was no indication Little needed medical care [Doc. 60-17, pg. 12], that Little's speech was clear (although he does not remember what was said) [Doc. 81-11, pgs. 6–7], that Little had been to the hospital [*Id.* at pg. 25], and that Little looked drowsy but he had been up all night. However, a jury would be entitled to disregard these explanations. *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005) (citing *Johnson v. Karnes*, 398 F.3d 868, 876 (6th Cir. 2005) ("[A] jury would be entitled to discount [defendant's] explanation."). In sum, a jury could reasonably find that given Officer Smith's knowledge of Little's drug use and symptoms and the fact that Little laid prone and motionless on the floor for an extended period of time, he had knowledge of facts from which he either knew or should have known of an unjustifiably high risk to Little and recklessly disregarded that risk.

<u>Clearly Established</u>

Finding genuine disputes of fact as to whether Officers Gillett, McFarland, and Smith violated Little's Fourteenth Amendment rights, the next step in the inquiry is whether such right was clearly established at the time of the alleged violative conduct. For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would

18

understand that what he is doing violates that right." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). A court need not "find a case in which 'the very action in question has previously been held unlawful,' but, 'in the light of pre-existing law, the unlawfulness must be apparent.'" *Id*. (alterations and citation omitted). In actions such as this one, where the applicable law has changed, the Court must rely on case law in existence prior to the change in the law. *Trozzi*, 29 F.4th at 761 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004)) ("a change in the law (such as *Brawner*) that occurs after the official's conduct is 'of no use in the clearly established inquiry.'").

Despite the Sixth Circuit's recent modification of the subjective prong, "[t]he Supreme Court has long recognized that the government has a constitutional obligation to provide medical care to those whom it detains." *Griffith v. Franklin Cty.*, 975 F.3d 554, 566 (6th Cir. 2020) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (additional citations omitted). In the Sixth Circuit, a pretrial detainee's right to medical care for a serious medical need has been established since at least 1987. *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005) (citing *Heflin v. Stewart County*, 958 F.2d 709, 717 (6th Cir. 1992). In fact, "[a]s early as 1972, [the Sixth Circuit held] that 'where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process.'" *Id*. (quoting *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972)).

Viewing the facts and drawing all reasonable inferences in the light most favorable to Plaintiffs, there is a genuine dispute as to whether the circumstances presented to Officers Gillett, McFarland, and Smith were clearly sufficient to indicate the need for medical care. If those factual disputes are ultimately resolved in Plaintiffs' favor, Little's right to medical care was clearly established. *See Border v. Trumbull Cnty. Bd. of Comm'rs*, 414 F. App'x 831, 838 (6th Cir. 2011)

(summary judgment denied where detainee died of an overdose after officer booked detainee into jail and, despite his obvious intoxication and the officer's apparent knowledge that the detainee was under the influence of drugs, failed to inform medical personnel). Accordingly, Officers Gillett, McFarland, and Smith are not entitled to qualified immunity.

Based on the foregoing, the City Defendants' motion as it relates to Plaintiffs' claim for failure to provide medical care is **GRANTED** as to Officer Johnson and **DENIED** as to Officer Gillett, and the County Defendants' motion is **GRANTED** as to Corporal Brown and Officer Miller and **DENIED** as to Officers McFarland and Smith. The Fourteenth Amendment claim for failure to provide medical care against Officer Johnson, Corporal Brown, and Officer Miller is **DISMISSED**.

### 2. Supervisory Liability

The City Defendants move for summary judgment on the supervisory liability claim against Chief Overholt [Doc. 66, pg. 29], and the County Defendants seek summary judgment on the supervisory liability claims against Sheriff Jarnagin and Captain Laws [Doc. 61, pg. 11]. In response, Plaintiffs expressly abandon all claims against Chief Overholt [Doc. 87, pg. 1, n.1]. Thus, the City Defendants' motion for summary judgment is **GRANTED** as to all claims against Chief Overholt and those claims are **DISMISSED**. As to Sheriff Jarnagin and Captain Laws, the County Defendants argue no supervisory liability exists because Plaintiffs have failed to submit any evidence of active unconstitutional behavior and neither Sheriff Jarnagin nor Captain Laws were present at the jail at the time of the March 8, 2020 incident [Doc. 61, pg. 11]. Plaintiffs seek to impose liability against Sheriff Jarnagin and Captain Laws for employing a policy, custom, or practice of deliberate indifference to inmate safety and for failing to train or supervise Jail officials.

20

Supervisory liability "cannot be based on a theory of *respondeat superior*." *Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)). "There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). Plaintiffs assert that despite numerous reports from the Tennessee Corrections Institute ("TCI") "detailing the abysmal conditions at the Jail and explaining how those conditions directly compromised inmate safety," Sheriff Jarnagin and Captain Laws have taken little action to change those conditions [Doc. 78, pg. 19]. Specifically, Plaintiffs argue Sheriff Jarnagin and Captain Laws provide no training that would permit Jail officials to manage the severely overcrowded and understaffed Jail or to comply with Jail policies intended to protect inmate health [*Id*. at pg. 18]. This lack of training and supervision, Plaintiffs argue, constitutes deliberate indifference to the safety of inmates and was a substantial factor in Little's death [*Id*. at pg. 19].

The failure to train, without more, is not enough to impose individual liability against Sheriff Jarnagin and Captain Laws. The Sixth Circuit has held that an attempt to hold supervisors "liable in their individual capacities for their alleged failure to adequately train employees . . . 'improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability.'" *Harvey v. Campbell Cnty.*, 453 F. App'x 557, 563 (6th Cir. 2011) (quoting *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008)); *see Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 845 (E.D. Tenn. 2011) ("A general 'failure to train' claim has been routinely rejected by the Sixth Circuit in this context (trying to impose liability on a supervisor in his or her individual capacity)."). Plaintiffs must show that Sheriff Jarnagin and Captain Laws "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct" complained of.

21

*Bellamy*, 729 F.2d at 421. Beyond the assertion of a general failure to train, Plaintiffs have presented no evidence that either Sheriff Jarnagin or Captain Laws encouraged the alleged misconduct or in some other way directly participated in it. Thus, the County Defendants' motion is **GRANTED** in this respect and the claims alleging supervisory liability against Sheriff Jarnagin and Captain Laws are **DISMISSED**.

### 3. Municipal Liability

Plaintiffs also seek to hold the City and County liable for the constitutional violations allegedly suffered by Little while in the custody of Officer Gillett and while detained at the Jail. The City and County Defendants assert Plaintiffs have failed to establish a sufficient basis for municipal liability. In response, Plaintiffs abandon all claims against the City [Doc. 87, pg. 1, n.1]. Accordingly, the City Defendants' motion for summary judgment is **GRANTED** as to all claims against the City and those claims are **DISMISSED**. Thus, the only municipal liability claims remaining are those against the County.

The County Defendants contend no basis for municipal liability exists [Doc. 61, pg. 14]. Plaintiffs' asserted bases for municipal liability against the County are similar to those asserted with respect to the supervisory liability of Sheriff Jarnagin and Captain Laws. Namely, Plaintiffs contend the County engaged in a custom or practice of failing to remedy rampant policy violations and chronically unsafe Jail conditions that endanger inmate safety and systematically failed to train Jail officials, both of which amount to a policy of deliberate indifference and were a moving force behind Little's death [Doc. 78, pg. 23].

Similar to supervisory liability, "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("*Respondeat superior* or vicarious liability will not attach under §

1983."). Liability must be based upon "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Id.* "The 'policy' requirement is meant to distinguish those injuries for which county is responsible under § 1983, from those injuries for which the county should not be held accountable" and "ensures that a county is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the county." *Gregory v. Shelby Cnty.*, 220 F.3d 433, 441 (6th Cir. 2000).

The County Defendants argue Plaintiffs have presented no evidence of a County policy and/or custom which caused the alleged violations of Little's Fourteenth Amendment rights [Doc. 61, pg. 14]. "There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). A plaintiff may rely on "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Id.* Plaintiffs proceed under the latter two policy-establishing avenues. First, Plaintiffs assert the County engages in a custom or practice of ignoring flagrant policy violations and unsafe jail conditions. To prevail under this theory of inaction, Plaintiffs must establish:

> (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the "moving force" or direct causal link in the constitutional deprivation.

*Thomas*, 398 F.3d at 429 (alterations and citation omitted).

Although Sheriff Jarnagin testified that he and the other County officials maintain the jail as best as they can [Doc. 65-8, pg. 2], the Jail has been decertified by the TCI since 2010 for failure

23

to meet applicable minimum safety standards [Doc. 81-13, pg. 5].  The lack of certification is largely due to overcrowding, lack of adequate staffing, and security concerns, which are all within the control of the County [Doc. 81-13, pgs. 27–72].  The Sixth Circuit recently detailed the primary issues with the Jail:

> Most of the jail's problems stem from . . . "chronic" overcrowding. According to the 2016 report from the [TCI], the jail has a maximum capacity of 255 inmates, but housed an average of 365 inmates during the first half of 2016. This overcrowding creates safety risks. . . . [U]p to 100 inmates must sleep on mats on the floor during times of peak overcrowding. . . . Staffing shortages exacerbate the safety concerns. The reports from the [TCI] have repeatedly noted that the jail needs more corrections officers.
>
> . . .
>
> As the report from Carter Goble Associates concludes, "the jail is overcrowded, understaffed, and has an antiquated design." Sheriff Jarnagin has taken some steps to combat these problems. When he became sheriff in 2006, he told the Hamblen County Commissioners . . . that the county would need a new jail soon. The commissioners have opted not to build one. They have, however, increased funding for the jail, which has allowed administrators to hire about 16 new corrections officers since 2010. Still, the same problems that existed in 2010 continue to exist today. Sheriff Jarnagin and Chief Deputy Mize have notified the commissioners over and over again of the continued risks and the need to address the problem. But the commissioners have told Sheriff Jarnagin that they cannot fix this jail issue due to "[b]udget restraints."

*Beck v. Hamblen Cnty., Tennessee*, 969 F.3d 592, 597–98 (6th Cir. 2020).  The TCI reports from the three years prior to Little's death list the Jail's lack of "sufficient staff to perform the functions relating to security, custody, and supervision of inmates" as one of the many issues preventing certification and note that this was "a direct reflection of insufficient staffing to perform the necessary duties to maintain the safety and security throughout the facility." [Doc. 81-13, pg. 30 (2017), pg. 36 (2018), pg. 42 (2019)].

Relying on the foregoing, a reasonable juror could conclude that there was a clear and persistent pattern of reckless disregard to inmate safety of which the County had actual notice.

24

The County's failure to address and resolve these concerns despite pleas for help from Jail administration also creates a genuine dispute as to whether the County tacitly approved the unconstitutional conduct, such that their deliberate indifference to inmate safety could reasonably be said to amount to an official policy of inaction. In the absence of such official policy of inaction, it may also be reasonably inferred that Little would have been properly supervised and secure while at the Jail. Specifically, TCI noted problems with the "common area" where Little was lying on a mat waiting to be booked, including lack of security checks and insufficient documentation of security checks due to understaffing [Doc. 81-13, pg. 20]. A reasonable juror could conclude that had the Jail been adequately staffed with officials who could properly perform security checks, Little's need for medical care would not have been disregarded.

Due to the existence of genuine disputes of fact regarding the County's policy of inaction, the Court need not address Plaintiffs' second theory of liability—systematic failure to train officers on matters affecting inmate safety. Nevertheless, it is important to note that Plaintiffs, at this point, have failed to present sufficient evidence to support such a theory of liability. The Sixth Circuit has recognized "at least two situations in which inadequate training could be found to be the result of deliberate indifference[:]" (1) "failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction" and (2) "where the [municipality] fails to act in response to repeated complaints of constitutional violations by its officers." *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003) (citations omitted).

Plaintiffs have neither provided any similar incidents or prior complaints regarding the failure to medically attend to an inmate suffering from an overdose or similar medical condition at the Jail, nor have they pointed to foreseeable consequences resulting from a lack of instruction. Rather, Plaintiffs focus, for the most part, on Officer Smith's actions of accepting inmates into the

Jail without having been trained to do so and his failure to follow established Jail policy regarding the admission and medical evaluation of incoming inmates [Doc. 78, pg. 25].

The Jail policy is clear regarding the procedure for admission and the requirement of a medical evaluation. The admissions officer is supposed to visually observe the inmate for obvious signs of injury or illness and refuse to accept the inmate if there are signs the inmate needs immediate medical attention [Doc. 81-14, pg. 1]. Another policy provides that inmates brought into the Jail must be medically evaluated before being accepted into the facility and the admissions officer is directed to ask the following specific questions of the inmate: "are you ill; are you injured; are you under critical medical care?" [Doc. 81-11, pg. 35]. Although it is undisputed Officer Smith did not comply with these policies, to hold the County liable for Officer Smith's actions, without more, would amount to nothing more than vicarious liability, which is an improper basis for municipal liability under Section 1983.

Nonetheless, the record is sufficient to create a genuine dispute as to whether the County acted with deliberate indifference to the safety and security of inmates at the Jail through a policy of inaction. Accordingly, the County Defendants' motion for summary judgment on this claim is **DENIED**.

### B. State Law Claims

In addition to their Section 1983 claims, Plaintiffs assert state-law claims for negligence and/or gross negligence and IIED. Plaintiffs concede that their wrongful death claim is not a separate claim for them to assert, as it merely preserved Little's right of action [Doc. 87, pg. 4].[10] Therefore, the remaining two claims are addressed in turn.

---

[10] *Lynn v. City of Jackson*, 63 S.W.3d 332, 336 (Tenn. 2001) ("Tennessee's wrongful death statute does not create a new cause of action for the beneficiaries but instead preserves the right of action of the decedent.").

### 1. Negligence or Gross Negligence

The County Defendants assert they are entitled to summary judgment on Plaintiffs' negligence-based claims because the County is entitled to immunity and Plaintiffs have failed to present any evidence of causation [Doc. 61, pg. 16]. The City Defendants assert that Chief Overholt and Officers Gillett and Johnson are immune from liability for claims arising out of negligence and, because they were not deliberately indifferent, they also could not have been negligent [Doc. 66, pg. 31]. Plaintiffs expressly abandon this claim against the County, the City, and Chief Overholt [Doc. 78, pg. 26, n.19; Doc. 87, pg. 1, n.1]. Thus, this claim is proceeding only as to Officers Gillett and Johnson and the individual County officials.

At the outset, the Court must address the City Defendants' argument that Officers Gillett and Johnson are immune from liability under the Tennessee Governmental Tort Liability Act ("TGTLA") [*See* Doc. 66, at 31]. The TGTLA provides governmental entities with immunity "from suit for any injury which may result from the activities of such governmental entities wherein such governmental entities are engaged in the exercise and discharge of any of their functions, governmental or proprietary." Tenn. Code Ann. § 29-20-201(a). The TGTLA subsequently removes such immunity for an "injury proximately caused by a negligent act or omission of any employee within the scope of his employment," but provides a list of exceptions to this removal of immunity. Tenn. Code Ann. § 29-20-205. The second exception provides that immunity is not removed "if the injury arises out of…civil rights." *Id*. This "'civil rights' exception has been construed to include claims arising under 42 U.S.C. § 1983 and the United States Constitution." *Johnson v. City of Memphis*, 617 F.3d 864, 872 (6th Cir. 2010).

A claim of negligence falls within the civil rights exception when it "arises out of the same circumstances giving rise to [the] civil rights claim under § 1983." *Id*. The TGTLA also provides

government employees with immunity, but only in those situations where the government does not retain immunity. *Colson v. City of Alcoa*, 458 F. Supp. 3d 887, 936 (E.D. Tenn. 2020). In sum, "the TGTLA does not provide governmental entities and employees with simultaneous immunity." *Id*. Here, Plaintiffs' negligence claims arise out of the same conduct underlying their Section 1983 claims for failure to protect and failure to provide medical care and, as a result, fall within the civil rights exception of the TGTLA. Accordingly, the City and County retain their immunity. As a result, the individual officials are not immune.

Turning to the Plaintiffs' negligence-based claims, they must establish the following for a claim of negligence: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct falling below the applicable standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, cause." *McClenahan v. Cooley*, 806 S.W.2d 767, 774 (Tenn. 1991). In contrast, a claim of gross negligence requires the aforementioned elements plus proof that the defendant acted "with utter unconcern for the safety of others, or . . . with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law . . ." *Leatherwood v. Wadley*, 121 S.W.3d 682, 694 (Tenn. Ct. App. 2003) (citation omitted).

First, the City Defendants' argument that a failure to establish Fourteenth Amendment deliberate indifference also results in a failure to establish negligence is not well-taken. Although the elements of a gross negligence claim mirror those of a deliberate indifference claim, simple negligence is a much lower standard than deliberate indifference. An official's action may still be negligent even if it does not rise to the level of deliberate indifference. Additionally, the Court has determined there are genuine disputes of fact as to whether Officers Gillett, Smith, and McFarland acted with deliberate indifference. Consequently, the same genuine issues of fact exist with respect to a claim of gross negligence for those defendants.

28

Finally, the City and County Defendants argue Plaintiffs cannot satisfy the causation element [Doc. 61, at 16; Doc. 66, at 32]. However, "[c]ause in fact and proximate cause are 'ordinarily jury questions, unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome.'" *Haynes v. Hamilton County*, 883 S.W.2d 606, 612 (Tenn. 1994) (citing *McClenahan*, 806 S.W.2d at 775). With all inferences flowing in favor of the Plaintiffs, the Court finds the record contains sufficient evidence of causation.

Based on the foregoing, the City and County Defendants' motions are **GRANTED** as to the negligence-based claims against the City, County, and Chief Overholt. However, the motions are **DENIED** as to the negligence-based claims against the remaining individual defendants.

### 2. Intentional Infliction of Emotional Distress

Plaintiffs assert a claim of IIED against Officers Gillett and Smith. To prevail, Plaintiffs must show that these officers engaged in conduct "so outrageous that it is not tolerated by civilized society." *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 502 (Tenn. 2012) (internal citation omitted). To explain what qualifies as outrageous conduct, the Tennessee Supreme Court has adopted the following language from the Restatement (Second) of Torts:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

*Bain v. Wells*, 936 S.W.2d 618, 623 (Tenn. 1997) (quoting Restatement (Second) of Torts § 46 comment d (1965)). Although there is evidence that Officers Gillett and Smith acted with deliberate indifference, Plaintiffs have not shown that the officers' conduct was so egregious as to

29

meet the high standard required for IIED.  Accordingly, the City and County Defendants' motions are **GRANTED** with respect to the claim of IIED against Officers Gillett and Smith and this claim is **DISMISSED**.

## IV.     CONCLUSION

Accordingly, for the reasons stated above, Defendants' motions for summary judgment are **GRANTED IN PART AND DENIED IN PART**.  For purposes of clarity, the remaining claims pending for trial are as follows:

1.     Fourteenth Amendment failure to provide adequate medical care against Officer Gillett (Count 2) and Officers Smith and McFarland (Count 6);

2.     Fourteenth Amendment failure to protect against Corporal Brown, and Officers Smith, Miller, and McFarland (Count 5);

3.     Section 1983 municipal liability against the County (Counts 7 and 8); and

4.     Negligence and/or gross negligence against Sheriff Jarnagin, Captain Laws, Corporal Brown, and Officers Gillett, Johnson, Smith, Miller, and McFarland (Count 10).

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge